1
2
3
4
5
6

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

7
8
9  CARLOS A. CANEZ,                              CV F 02-6067 REC DLB HC

10                      Petitioner,              FINDINGS AND RECOMMENDATIONS
                                                 REGARDING PETITION FOR WRIT OF
11         v.                                    HABEAS CORPUS

12                                               [Doc. 1]
     RICHARD E. EARLY, Warden
13
                        Respondent.
14  _____/

15
16         Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

17  pursuant to 28 U.S.C. § 2254.

                              PROCEDURAL HISTORY[1]

18         On August 3, 1998, following a jury trial in the Kern County Superior Court, Petitioner

19  was convicted of two counts of second degree murder in violation of California Penal Code[2]

20  section 187, subdivision (a), one count of driving under the influence of alcohol or drugs or their

21  combined influence in violation of California Vehicle Code sections 22107 and 22352, with an

22  enhancement of causing bodily injury or death to more than one victim within the meaning of

23  California Vehicle Code section 23153, subdivision (a), and one count of being under the

24  influence of a controlled substance in violation of California Health and Safety Code section

25  11550, subdivision (a).  It was further alleged that Petitioner had served four prior prison terms

26
27         [1] This information is derived from the petition for writ of habeas corpus and Respondent's answer.

28         [2] All further statutory references are to the California Penal Code, unless otherwise indicated.

1  within the meaning of Penal Code 667.5, subdivision (b).  (CT 128-138; 301-302.)  Following a
2  bifurcated trial on the four prior conviction allegations, the trial court found each of them to be
3  true.  (CT 128-129; 301-302.)

4      On August 31, 1998, Petitioner was sentenced to thirty nine years to life in state prison,
5  calculated as follows: Count III (Cal. Veh. Code[3] § 23153, subd. (a)) - the upper term of three
6  years, plus two years for the multi-victim bodily injury enhancement (§ 23182); in counts I and II
7  (§ 187, subd. (a)) two consecutive fifteen years to life sentences; and an additional four years for
8  the prior prison term enhancements (§ 667.5).  (CT 323-328.)

9      Petitioner filed a timely notice of appeal with the California Court of Appeal, Fifth
10  Appellate District.  (Respondent's Lodged Doc. No. 1.)

11      On March 10, 2000, the Court of Appeal affirmed the judgment.  (Respondent's Lodged
12  Doc. No. 3.)

13      On April 19, 2000, Petitioner filed a petition for review with the California Supreme
14  Court.  (Respondent's Lodged Doc. No. 4.)  On May 24, 2000, the petition was denied.  (Id.)

15      On April 27, 2001, Petitioner filed a petition for writ of habeas corpus with the California
16  Supreme Court.  (Respondent's Lodged Doc. No. 5.)  The petition was denied on September 26,
17  2001.  (Id.)

18      Petitioner filed the instant petition for writ of habeas corpus on September 4, 2002.

19      On November 18, 2002, Respondent filed a motion to dismiss the petition on the ground
20  that it was filed beyond the one-year statute of limitations and the petition was untimely.

21      On June 4, 2003, the motion to dismiss the petition was granted and judgment was
22  entered in favor of Respondent.

23      On June 24, 2003, Petitioner filed a notice of appeal to the United States Court of
24  Appeals for the Ninth Circuit and moved for the issuance of a certificate of appealability.  On
25  July 14, 2003, the certificate was granted.

26      On December 10, 2004, the Ninth Circuit Court of Appeals reversed and remanded the

27

28

[3] All further statutory references are to the California Penal Code unless otherwise indicated.

1    action to this Court.

2        On January 13, 2005, the Court directed Respondent to submit an answer to the petition.

3        Respondent filed his answer on May 18, 2005, and Petitioner filed a traverse on July 27,

4    2005.

5                            STATEMENT OF FACTS

6        On February 24, 1998, Petitioner was driving his 1988 Chevrolet Camaro, with his

7    passenger Ruben Pinon, east on Niles Avenue in Bakersfield, California.  (II RT 110, 122-124.)

8    Petitioner was driving at a high rate of speed, estimated by one witnesses as being 80 miles per

9    hour. (II RT 144-147.)  Petitioner was darting in and out of traffic as he passed the cars in front

10   of him. (II RT 144-147, 232.)

11       Talmage and Rose Ann Green had just left a pizza parlor and were traveling east on Niles

12   Avenue when they were approached from behind by Petitioner, who at a high rate of speed

13   passed their vehicle nearly striking it, causing them to pull off to the side of the road.  (II RT 144-

14   146, 148, 174-175.)  As the Camaro passed, Mr. Green observed the passenger, smile at him.  (II

15   RT 147-149, 152-154, 171-175.)  Ms. Green observed the Camaro pass their truck, and she did

16   not observe any activity between the passenger and the driver. (II RT 176-177.)

17       Petitioner approached the intersection of Niles and Shalimar, and then suddenly made a

18   right-hand turn against the red light.  (II RT 148-151, 173-175.)

19       Brent Petersen was standing outside in the front yard of a residence that faced Shalimar

20   Avenue, a residential street, and his truck was parked on Shalimar.  As Petitioner was driving

21   fast down Shalimar, he struck Mr. Petersen's pickup that was parked on the side of the road.

22   Petitioner, without stopping, accelerated and continued down Shalimar Avenue at a high rate of

23   speed. (II RT 119-129.)

24       Ira Hill was driving his truck south on Shalimar Avenue when the Camaro struck the rear

25   of his truck pushing it forward.  Petitioner swerved and passed the truck on the right-hand side,

26   and then subsequently lost control of his Camaro.  At which point, the Camaro skidded sideways

27   across Shalimar Avenue into the northbound lanes of traffic.  (II RT 127, 188-191.)

28       Sarah Adams, her mother Virginia Adams, her sister Katherine Tange, and her brother-in-

1  law Clyde Tange, were all traveling in Sarah's brother's Honda Accord northbound on Shalimar

2  Avenue, when Petitioner's Camaro skidded across Shalimar Avenue striking their vehicle. (II

3  RT 196-201.)

4      The Camaro left 220 feet of front and side skid marks across Shalimar Avenue, including

5  40 feet of skidmarks that were left after the Camaro broadsided the front end of Adams' Honda.

6  (II RT 263-264.) Petitioner's Camaro ended up flipped upside down and partially resting on the

7  top of the Honda. (II RT 215.) Pinon and Virginia Adams both died on impact from blunt force

8  trauma. (II RT 215-220, IV RT 517-523.) Sarah Adams, Katherine and Clyde Tange, all

9  suffered injuries as a result of the collision. (II RT 199-200, 207, 210.) The range of Petitioner's

10  observed erratic driving spanned a one mile radius. (II RT 143; III RT 364-365.)

11      Petitioner was escorted by ambulance to Memorial Hospital. Paramedic George Baker

12  noticed that Petitioner appeared to be under the influence of an opiate and that his arms had

13  abscesses from injecting heroin. (IV RT 656-662.)

14      While at the hospital, Petitioner was examined by California Highway Patrol Officer

15  Travis Mitchell, who observed that Petitioner's pupils were constricted, there were injection sites

16  on his let arm, his eyelids were droopy, his speech was slow and deliberate, and he "nodded off"

17  frequently when speaking with the officer. Petitioner admitted to officer Mitchell that he had

18  used black tar heroin at about 4 p.m. that day. (II RT 290-291.) It was officer Mitchell's expert

19  opinion that Petitioner was under the influence to the extent that he could not operate a vehicle

20  safely. (II RT 288-291.) Officer Mitchell testified that a heroin addict under the influence might

21  appear normal, but yet be mentally impaired. The heroin slows down the ability to perform the

22  range of tasks necessary for driving a vehicle. (IV RT 732-735.)

23      Blood and urine samples were taken from Petitioner and he tested positive for

24  amphetamines, opiates and PCP. (III RT 372, 478-480, 492-495.) It was determined that

25  Petitioner's PCP level was four micrograms per milliliter, or 40 nanograms per milliliter. (III RT

26  463, 473, 478-481.) Another criminalist, calculated the methamphetamine in Petitioner's blood

27  at .37 micrograms per million and opiates at .43 micrograms per million. (III RT 493.) Pinon

28  had also used PCP before he died. (IV RT 633-635.)

1  In 1990, while incarcerated in jail, Petitioner attended a substance abuse program.  (III RT

2  415-416.)  Part of the program consisted of the dangers associated with driving under the

3  influence including the fact that individuals could be killed as a result.  (III RT 452-453.)

4  On December 6, 1995, Petitioner was arrested after he was found passed out in the

5  driver's seat of his car stopped in the middle of a traffic lane with the engine running.  (III RT

6  420-422.)  Petitioner admitted that he had been driving under the influence of heroin and that he

7  had injected too much to drive safely.  (III RT 444.)

8  <u>Defense Case</u>

9  Petitioner testified in his own defense, and admitted that he was a heroin addict.  On

10  February 24, 1998, at around 2 p.m., Pinon went to Petitioner's house and asked for a ride to his

11  mother's house in Arvin, and Petitioner agreed.  (IV RT 592-593.)  Prior to leaving his home,

12  Petitioner injected "20 units" of heroin.  (IV RT 597-598.)  Petitioner stated that using the heroin

13  makes him feel normal, and without it he goes into withdrawal.  (IV RT 597-598.)

14  Petitioner, with Pinon, drove to a McDonald's in Lamont, to collect money from his

15  employer, Tony Torres, who was Pinon's ex-wife's boyfriend.  (IV RT 593-595.)  While Pinon

16  waited in the car, Petitioner went into McDonald's, collected his money, and on the way back to

17  his car, he ran into his niece, Geraldine Flores, and he spoke with her for a few minutes.  (IV RT

18  596-597.)  Thereafter, Petitioner and Pinon purchased some food from McDonald's and drove to

19  a friend's house in Lamont.  (IV RT 594-601.)

20  Next, Petitioner and Pinon drove to the home of Pinon's friends in Bakersfield, at

21  approximately 5:30 p.m.  (IV RT 599-601.)  During this visit, Pinon shared two or three PCP

22  cigarettes with his friends.  (IV RT 602.)  Petitioner stated that he did not smoke any PCP during

23  that time.  (IV RT 601-602.)  However, Petitioner did acknowledge that he had used PCP three

24  days earlier and methamphetamine one or two days before.  (IV RT 600-603.)

25  Petitioner and Pinon left the residence after Petitioner observed the police patrolling up

26  and down the street.  (IV RT 599-604.)  Petitioner stated that as he was driving eastbound on

27  Niles Street, Pinon suggested that they go to another party.  Petitioner refused because he had to

28  go to work the next morning and needed to take Pinon home in Arvin.  (IV RT 604.)  Pinon

1   became upset and accused Petitioner of being disloyal to him by working for Tony Torres.  (IV

2   RT 605-606.)

3        As Petitioner realized that he needed gas, and looked over his shoulder preparing to make

4   a turn into a gas station, Pinon punched him twice in the face causing him to lose consciousness.

5   (IV RT 606.)  The next thing Petitioner remembered was being in the ambulance on the way to

6   the hospital.  (IV RT 606-607.)

7        Petitioner stated that he did not have any memory of the accident, nor any recollection of

8   arriving at the hospital or being in the x-ray room.  (IV RT 606-607.)   It was Petitioner's opinion

9   that on the day of the collision, he felt he could safely operate a motor vehicle.  He did not think

10  about the information he had learned from the substance abuse program in 1990 or about the

11  incident in December of 1995.  Petitioner did not believe that he was taking any risks.  (IV RT

12  610-612.)  On cross-examination, Petitioner did acknowledge seeing public service commercials

13  which depicted individuals being killed by individuals under the influence. (IV RT 620.)

                                DISCUSSION

15  A.    Jurisdiction

16       Relief by way of a petition for writ of habeas corpus extends to a person in custody

17  pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

18  or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,

19  529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000).  Petitioner asserts that he suffered

20  violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises

21  out of the Kern County Superior Court, which is located within the jurisdiction of this Court.  28

22  U.S.C. § 2254(a); 2241(d).

23       On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

24  of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

25  enactment.  Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114

26  F.3d 1484, 1499 (9th Cir. 1997), cert. denied, 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting

27  Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), cert. denied, 520 U.S. 1107, 117 S.Ct.

28  1114 (1997), overruled on other grounds by Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059

1   (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant

2   petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

3   B.     <u>Standard of Review</u>

4        This court may entertain a petition for writ of habeas corpus "in behalf of a person in

5   custody pursuant to the judgment of a State court only on the ground that he is in custody in

6   violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

7        The AEDPA altered the standard of review that a federal habeas court must apply with

8   respect to a state prisoner's claim that was adjudicated on the merits in state court. <u>Williams v.</u>

9   <u>Taylor</u>, 120 S.Ct. 1495, 1518-23 (2000).  Under the AEDPA, an application for habeas corpus

10   will not be granted unless the adjudication of the claim "resulted in a decision that was contrary

11   to, or involved an unreasonable application of, clearly established Federal law, as determined by

12   the Supreme Court of the United States;" or "resulted in a decision that was based on an

13   unreasonable determination of the facts in light of the evidence presented in the State Court

14   proceeding." 28 U.S.C. § 2254(d); <u>Lockyer v. Andrade</u>, 123 S.Ct. 1166, 1173 (2003)

15   (disapproving of the Ninth Circuit's approach in <u>Van Tran v. Lindsey</u>, 212 F.3d 1143 (9th Cir.

16   2000)); <u>Williams v. Taylor</u>, 120 S.Ct. 1495, 1523 (2000).  "A federal habeas court may not issue

17   the writ simply because that court concludes in its independent judgment that the relevant state-

18   court decision applied clearly established federal law erroneously or incorrectly." <u>Lockyer</u>, at

19   1174 (citations omitted).  "Rather, that application must be objectively unreasonable." <u>Id.</u>

20   (citations omitted).

21        While habeas corpus relief is an important instrument to assure that individuals are

22   constitutionally protected, <u>Barefoot v. Estelle</u>, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391-3392

23   (1983); <u>Harris v. Nelson</u>, 394 U.S. 286, 290, 89 S.Ct. 1082, 1086 (1969), direct review of a

24   criminal conviction is the primary method for a petitioner to challenge that conviction.  <u>Brecht v.</u>

25   <u>Abrahamson</u>, 507 U.S. 619, 633, 113 S.Ct. 1710, 1719 (1993).  In addition, the state court's

26   factual determinations must be presumed correct, and the federal court must accept all factual

27   findings made by the state court unless the petitioner can rebut "the presumption of correctness

28   by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); <u>Purkett v. Elem</u>, 514 U.S. 765, 115

1  S.Ct. 1769 (1995); Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457 (1995); Langford v. Day,

2  110 F.3d 1380, 1388 (9th Cir. 1997).

3       The court looks to the last reasoned state court decision as to the basis for the state court

4  judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002) (citing Ylst v. Nunnemaker, 501

5  U.S. 797, 803-04 (1991)).  Where the state court reaches a decision on the merits but provides no

6  reasoning to support its conclusion, a federal habeas court independently reviews the record to

7  determine whether habeas corpus relief is available under section 2254(d).  Delgado v. Lewis,

8  223 F.3d 976, 982 (9th Cir. 2000).

9  C.    Ineffective Assistance of Trial Counsel

10      Petitioner contends that his trial counsel provided ineffective assistance based on the

11  following claims: (1) the failure to seek expert testimony regarding intoxication evidence to

12  defeat the theory of implied malice; (2) the failure to insist that the jury be instructed pursuant to

13  CALJIC No. 4.21; (3) the failure to challenge Miranda violation issues, specifically the

14  statement's Petitioner made while in a state of shock; (4) the failure to challenge search and

15  seizure violations relating to Petitioner's blood and urine samples, and the chain of custody of

16  those samples; and (5) the failure to challenge Petitioner's statutorily unauthorized sentence.

17  (Petition, at 5, 5a1.)

18      Petitioner raised these claims in his state habeas corpus petition presented to the

19  California Supreme Court, which issued a summary denial.  (Respondent's Lodged Doc. No. 5.)

20  Therefore, this Court will independently review the record to determine whether relief is

21  available under section 2254(d).  Delgado, 223 F.3d at 982.

22      1.    Standard of Review

23      The law governing ineffective assistance of counsel claims is clearly established for the

24  purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d).  Canales v. Roe,

25  151 F.3d 1226, 1229 (9th Cir. 1998.)  In a petition for writ of habeas corpus alleging ineffective

26  assistance of counsel, the court must consider two factors.  Strickland v. Washington, 466 U.S.

27  668, 687, 104 S.Ct. 2052, 2064 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994).  First,

28  the petitioner must show that counsel's performance was deficient, requiring a showing that

1  counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by

2  the Sixth Amendment. <u>Strickland</u>, 466 U.S. at 687.  The petitioner must show that counsel's

3  representation fell below an objective standard of reasonableness, and must identify counsel's

4  alleged acts or omissions that were not the result of reasonable professional judgment

5  considering the circumstances. <u>Id.</u> at 688; <u>United States v. Quintero-Barraza</u>, 78 F.3d 1344, 1348

6  (9th Cir. 1995).  Judicial scrutiny of counsel's performance is highly deferential.  A court indulges

7  a strong presumption that counsel's conduct falls within the wide range of reasonable

8  professional assistance.  <u>Strickland</u>, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); <u>Sanders v.</u>

9  <u>Ratelle</u>, 21 F.3d 1446, 1456 (9th Cir.1994).

10  Second, the petitioner must demonstrate that "there is a reasonable probability that, but

11  for counsel's unprofessional errors, the result ... would have been different," 466 U.S. at 694.

12  Petitioner must show that counsel's errors were so egregious as to deprive defendant of a fair

13  trial, one whose result is reliable.  <u>Strickland</u>, 466 U.S. at 688.  The court must evaluate whether

14  the entire trial was fundamentally unfair or unreliable because of counsel's ineffectiveness.  <u>Id.</u>;

15  <u>Quintero-Barraza</u>, 78 F.3d at 1345; <u>United States v. Palomba</u>, 31 F.3d 1356, 1461 (9th Cir. 1994).

16  A court need not determine whether counsel's performance was deficient before

17  examining the prejudice suffered by the petitioner as a result of the alleged deficiencies.

18  <u>Strickland</u>, 466 U.S. 668, 697, 104 S.Ct. 2052, 2074 (1984).  Since the defendant must

19  affirmatively prove prejudice, any deficiency that does not result in prejudice must necessarily

20  fail.  However, there are certain instances which are legally presumed to result in prejudice, e.g.,

21  where there has been an actual or constructive denial of the assistance of counsel or where the

22  State has interfered with counsel's assistance. <u>See</u> <u>Strickland</u>, 466 U.S. at 692; <u>United States v.</u>

23  <u>Cronic</u>, 466 U.S., at 659, and n. 25, 104 S.Ct., at 2046-2047, and n. 25 (1984).

24  Ineffective assistance of counsel claims are analyzed under the "unreasonable

25  application" prong of <u>Williams v. Taylor</u>, 529 U.S. 362 (2000).  <u>Weighall v. Middle</u>, 215 F.3d

26  1058, 1062 (2000).  With this standard in mind, the Court now turns to each of Petitioner's

27  claims of ineffective assistance of counsel.

28  ///

9

a.    Failure to Present Intoxication Expert Testimony (Claim One)

Petitioner contends that trial counsel was ineffective for failing to present expert testimony on voluntary intoxication pursuant to California Penal Code section 22, subdivision (b), because according to Petitioner the testimony could have defeated the implied malice theory as to his second degree murder convictions.  (Petition at 5a-1.)

California Penal Code section 22, subdivision (b) states:

> Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored *express* malice aforethought.  (Emphasis added.)

Petitioner's claim is without merit since under California law he was not entitled to such evidence.  In People v. Martin, 78 Cal.App.4th 1107 (2000), the Fifth District Court of Appeal discussed the 1995 amendment to section 22, wherein the California Legislature amended section 22, subdivisions (a) and (b) to state: "No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his or her having been in that condition.  Evidence of voluntary intoxication shall not be admitted to negate the capacity to form any mental states for the crimes charged, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act[;] (b) Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought." Martin, at 1113 (citation and quotation marks omitted.)  As stated in Martin, "[i]t is clear that the effect of the 1995 amendment to section 22 was to preclude evidence of voluntary intoxication to negate implied malice aforethought." Id. at 1114; see also People v. Reyes, 52 Cal.App.4th 975, 984, fn.6 (1997).[4]  Petitioner's reliance on subsection (b) of section 22, overlooks the specific language in

---

[4] Prior to 1995, evidence of voluntary intoxication could be introduced to negate implied malice.  People v. Sanchez, 41 Cal.Rptr.3d 892, 895 (2006).  The pre-1995 version of section 22 stated, "Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged." Id.  The California Supreme Court held that the reference to malice aforethought was sufficiently broad to cover implied malice. Id. (citing People v. Whitfield, 7 Cal.4th 437, 446 (1994).)  In response to the holding in Whitfield, the

subsection (b), allowing evidence of voluntary intoxication to negate express, not implied malice.

It is clear that Petitioner was not entitled to present a voluntary intoxication defense to negate the

implied malice as to his second degree murder charges.

In any event, the effect of Petitioner's voluntary intoxication on his mental state was

thoroughly argued and presented to the jury for determination.  More specifically, during trial,

Petitioner himself testified that he had injected 20 units of heroin before leaving his home prior

to the fatal accident.  (IV RT 597-598.)  In addition, officer Mitchell testified that Petitioner

showed physical signs of being under the influence of heroin.  (IV RT 734-735.)

As Respondent submits, on cross-examination by defense counsel officer Mitchell

acknowledged that heroin could cause mental impairment to a user so that they may be unable to

recognize the seriousness of certain situations.  (IV RT 737.)  It was officer Mitchell's expert

opinion that a narcotic analgesic could impair the user's ability to consider the consequences of

their actions.  (Id.)  This testimony was the basis for defense counsel's closing argument, defense

counsel that Petitioner did not have the requisite mental state of conscious disregard necessary

for the implied malice element of second degree murder.  During closing argument, counsel

argued:

> Ladies and gentlemen, if after careful deliberation among the 12 of you,
> including consideration of the jury instruction on unconsciousness and the
> presumption regarding the consciousness that was read to you, even so if you
> conclude that [Petitioner] was, in fact, conscious at that time, your job is not over
> yet.
> Then, as [the prosecutor] discussed and as the Court discussed, you still
> have to keep going.  You still have to keep looking at this evidence, and that is
> when an important issue arises, and that is whether or not on the 24th of February,
> 1998, [Petitioner] was, in fact, actually aware, actually had in his mind the fact
> that "You know, if I drive I might kill somebody because I used heroin."
> It's not - - not it's not, hey he should have realized it.  Because when we're
> talking about the implied malice standard, find somebody guilty for second-degree
> murder, you can't be saying to yourself, "You know, I would never do that.  No
> one I know would do that.  We would all know better than to do that," because
> that's not the law on implied malice.  You have to be convinced beyond a
> reasonable doubt, all 12 of you, that he actually had it in his mind, actually
> appreciated the risk on the 24th of February, and if you have a doubt that he did,
> even though he should have, and, again, it's your responsibility under the
> constitution to acquit him of second-degree murder.

---

Legislature amended section 22, subdivision (b) in 1995, to explicitly exclude voluntary intoxication to negate
implied malice aforethought.  Sanchez, at 895.

And, again, he said he did it.  He testified on direct and on cross-examination and was very clear and said that he never considered that; that his actions would endanger others, could lead to death or injury on the 24th of February, and he told you why.

And whether you agree with him or not is not the legal test, but I am telling you look beyond that.  Look for corroboration.  What other evidence is there that's presented in this trial that supports a reasonable doubt as to whether or not he actually harbored, he actually formed that mental state.

And, again, I invite you to look to Officer Mitchell presented by the prosecution in this case, but here for all purposes, and he has a lot of say on this issue, and one of the things he tells us is that heroin will slow down your, you know, reactions and so forth.  He tells us that heroin may affect that type of reasoning and judgment that we're talking about in determining whether someone had actual thought in determining in their head when they're doing something like driving on the 24th of February that my actions may cause death or injury, and I'm going to do it anyway.

No, that's not how heroin users are thinking.

And, again, I tell you that the jury instruction tells you that if there is a reasonable doubt, if you lack the mental state, you know, you must find him not guilty of second-degree murder. . .

(VI RT 966-968.)

Petitioner's was able to present an argument and jury instructions in support of an voluntary intoxication defense which was inconsistent with then-existing California law. Petitioner has not, and cannot, demonstrate that there is a reasonable probability the outcome of his trial would have been different if defense counsel had called an expert witness.

In addition, as discussed below, the jury was specifically instructed pursuant to CALJIC NO. 4.21.1, that Petitioner's voluntary intoxication could be considered by the jury in deciding whether he had the requisite mental state, i.e. that "the act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life."  Based on the foregoing, Petitioner's claim fails, and the state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

b.    <u>Failure to Request Jury Instruction</u>

Petitioner contends that trial counsel was ineffective for failing to request the jury be instructed with CALJIC No. 4.21.

CALJIC No. 4.21 [Voluntary Intoxication - - When Relevant to Specific Intent] provides:

In the crimes of [], of which the defendant is accused in Count[s] [], [or that of [], which are lesser crimes thereto,] a necessary element is the existence in the mind of the defendant of the specific intent to [] or the mental state of [].

If the evidence shows that the defendant was intoxicated at the time of the

12

alleged crime, you should consider that fact in deciding whether defendant had the required specific intent.

If from all the evidence you have a reasonable doubt whether the defendant formed that specific intent, you must find that [he/she] did not have such specific intent.

In this case, with regard to voluntary intoxication, the jury was instructed with CALJIC

No. 4.21.1 [Voluntary Intoxication - - Trial With General And Specific Intent Crimes] which

states:

It is the general rule that no act committed by a person while in a state of voluntary intoxication is less criminal by reason of this condition

Thus, in the crime charged in Count 3, or the lesser crimes the fact that the defendant was voluntarily intoxicated is not a defense and does not relieve defendant of responsibility for the crime.

However, there is an exception to this general rule, namely, whether a mental state is an essential element of a crime, such as second degree murder. In that event you should consider the defendant's voluntary intoxication, if any, in deciding whether the defendant possessed the required mental state at the time of the commission of the alleged crime charged in counts 1 and 2.

Thus, in the crime of second degree murder, charged in counts 1 and 2, a necessary element is the existence in the mind of the defendant of a certain mental state which is included in the definition of the crime set forth elsewhere in these instructions.

If the evidence shows that the defendant was intoxicated at the time of the alleged crimes charged in counts 1 and 2, you should consider that fact in deciding whether or not the defendant had the required mental state.

If from all the evidence you have reasonable doubt whether the defendant had that mental state, you must find that defendant did not have that mental state.

(CT 223-224; VI RT 930-931.)

As Respondent correctly states, both CALJIC Nos. 4.21 and 4.21.1 are based on section

22, which provides guidance on the admission of evidence of voluntary intoxication, and sets

forth the instances in which voluntary intoxication excuses criminal conduct. People v. Martin,

78 Cal.App.4th at 1112.

Petitioner's claim that the trial court should have given CALJIC No. 4.21 regarding

specific intent crimes, is clearly without merit. The trial court correctly instructed the jury,

pursuant to CALJIC No. 8.11, malice is implied when: 1) the killing resulted from an intentional

act; 2) the natural consequences of the act are dangerous to human life; and 3) the act was

deliberately performed with knowledge of the danger to, and with conscious disregard for, human

life. (CT 195.)

1   The California Court of Appeal's holding in <u>Martin</u>[5] makes clear that voluntary

2   intoxication is not available to negate the implied malice element of second degree murder.

3   Although second degree murder with implied malice is not a specific intent crime, the trial

4   court's instruction pursuant to CALJIC No. 4.21.1 stated that voluntary intoxication could be

5   used to negate the finding that "the act was deliberately performed with knowledge of the danger

6   to, and with conscious disregard for, human life," the requisite mental state required for a

7   conviction of second degree murder.  Petitioner was therefore given more than his entitlement

8   under the law, and Petitioner's claim to the contrary fails on the merits.

9                     c.      Failure to Challenge Admission of Petitioner's Statements

10   Petitioner contends that counsel was ineffective for failing to raise a <u>Miranda</u> challenge to

11   statements he made while in a state of shock.  (Petition, at 5a-1.).   In reviewing Petitioner's writ

12   of habeas corpus filed in the California Supreme Court, Petitioner argued that trial counsel was

13   ineffective for failing to make an ongoing objection to the introduction of his statements to

14   officers Crosswhite and Mitchell at Memorial Hospital following the accident even though the

15   trial court did make a ruling that Petitioner's statements were not elicited in violation of Miranda.

16   (Respondent's Lodged Doc. No. 5, at 6.)  Petitioner claimed that a continuing or renewed

17   objection would have preserved the matter for subsequent appellate review.  (<u>Id</u>.)

18   The record shows that trial counsel did challenge the admissibility of petitioner's

19   admissions alleging a violation of <u>Miranda</u>.  Prior to trial and during the hearing held pursuant to

20   California Evidence Code section 402, officers Crosswhite and Mitchell testified as to the

21   circumstances surrounding the statements given by Petitioner while he was at Memorial

22   Hospital.[6]  Nothing more was necessary to preserve the issue for appeal.

23

24

25      [5] In addition, the use notes to CALCRIM, section 3426, regarding voluntary intoxication as a defense
26   specifically states that "[E]vidence of voluntary intoxication is no longer admissible on the issue of implied malice
     aforethought."  (citing <u>People v. Martin</u> 78 Cal.App.4th 1107, 1114-1115, quoting <u>People v. Reyes</u>, 52 Cal.App.4th
27   975, 984, fn.6.)

28      [6] A majority of this information is taken from Respondent's answer, as it correctly sets forth the evidence
     presented at that hearing.  (<u>See</u> Answer, at 21-23.)

14

1    Under <u>Miranda</u>, a person in custody must be informed before interrogation that he has a

2    right to remain silent and to have a lawyer present.  <u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S.Ct.

3    1602 (1966).  "An officer's obligation to administer Miranda warnings attaches only where there

4    has been such a restriction on a person's freedom as to render him in custody."  <u>United States v.</u>

5    <u>Crawford</u>, 372 F.3d 1048, 1059 (9th Cir. 2004) (citation, alteration and internal quotation marks

6    omitted).  A person is in custody only where "there is a formal arrest or restraint on freedom of

7    movement of the degree associated with a formal arrest."  <u>Id</u>. (citation and internal quotation

8    marks omitted).  The court must "examine the totality of the circumstances from the perspective

9    of a reasonable person in the suspect's position.  <u>Id</u>. (citation omitted).  Several factors relevant

10   to this determination are "the extent to which [the person being questioned] is confronted with

11   evidence of guilt" and "the degree of pressure applied to detain the individual."  <u>United States v.</u>

12   <u>Booth</u>, 669 F.2d 1231, 1235 (9th Cir. 1981).

13        California Highway Patrol Officer Crosswhite testified that on February 24, 1998, he was

14   dispatched to the scene of a traffic collision fatality on Shalimar Avenue in Bakersfield,

15   California.  (I RT 36.)  Officer Crosswhite spoke with the witnesses for approximately an hour,

16   and then went to the hospital to further investigate the accident.  (I RT 37.)  Crosswhite made

17   contact with Petitioner, and requested a drug expert to come and evaluate him to determine

18   whether he was under the influence.  (I RT 38.)  Officer Mitchell, who was trained in evaluating

19   persons suspected of being under the influence of drugs, responded to the hospital.  (I  RT 38, 51-

20   52.)  Officer Crosswhite testified that officer Mitchell looked at Petitioner, and asked him a few

21   questions, including whether he had been using heroin.  (I RT 38-39.)  Petitioner said "yes," and

22   stated that he had shot a 20 of heroin in his left arm at 4 p.m. that day.  (I RT 39.)  During this

23   time, Petitioner was laying in the hospital bed next to an x-ray machine, and was not being

24   restrained in any way.  (I RT 39-40.)  Petitioner was never told that he was under arrest or not

25   free to leave.  (I RT 41.)  Shortly after officer Mitchell concluded his evaluation, Petitioner was

26   placed under arrest for driving under the influence of drugs.  (I RT 42.)

27        Officer Mitchell testified that he was specially trained (since 1984) to evaluate

28   individuals suspected of being under the influence of a controlled substance, and was also an

15

1   instructor training other officers in performing that type of evaluation.  (I RT 51-52.)  After being

2   dispatched to the hospital on February 24, 1998, at approximately 9 p.m., he was asked to go to

3   one of the x-ray rooms in the hospital to determine whether Petitioner was under the influence.  (I

4   RT 53.)  Mitchell, along with officer Crosswhite went into the x-ray room and initially noticed

5   that Petitioner's eyelids were droopy.  (I RT 53.)  After engaging in general conversation with

6   Petitioner, officer Mitchell noticed that Petitioner's speech was slurred, slowed, and his voice

7   was raspy.  His pupils were constricted and he nodded off when not talking with officer Mitchell.

8   (I RT 54, 58.)  It was officer Mitchell's opinion that these observations were consistent with and

9   were good indications that Petitioner was under the influence of a narcotic analgesic.  (I RT 54.)

10      In observing Petitioner, officer Mitchell noticed several injection sites on Petitioner's left

11   arm, and asked him when he last used.  (I RT 54.)  Petitioner replied that he used 20 CC's of

12   heroin around 4 p.m. that afternoon.  (I RT 54.)  Officer Mitchell asked Petitioner whether he had

13   used black, or black and white heroin.  (I RT 56.)  Petitioner stated that he had used black heroin.

14   (I RT 56.)

15      Officer Mitchell conveyed to officer Crosswhite and Sergeant Lopez that it was his

16   opinion that Petitioner was under the influence of a narcotic analgesic to the degree that he could

17   not safely operate a motor vehicle.  (I RT 59.)

18      Following the presentation of the evidence and argument by both counsel, the trial court

19   ruled that at the time of Officer Mitchell's interview with Petitioner, Petitioner was not under

20   arrest, was not being detained, and was therefore not in a custodial setting.  (I RT 65.)  Although

21   the trial court did acknowledge that Petitioner was not free to leave at the time of the questioning,

22   his inability to leave was not caused by the officers.  In addition, the trial court did not find any

23   indicia of coercion, and concluded that Miranda warnings were not warranted during officer

24   Mitchell's questioning.  (I RT 65.)  Based on this finding, the trial court ruled that Petitioner's

25   statements to officer Mitchell were admissible at trial.  (I RT 68.)

26      Petitioner's claim fails on the merits.  Trial counsel was not ineffective for failing to

27   make an ongoing Miranda objection to the admissibility of his statements, after the trial court had

28   ruled the statements admissible.  As Respondent argues, trial counsel vigorously fought to have

1   Petitioner's statements excluded during trial; however, the trial court denied the motion.

2   Counsel's failure to make futile objections does not constitute ineffective assistance of counsel.

3   Shah v. United States, 878 F.2d 1156, 1162 (9th Cir. 1989).

4       Moreover, Petitioner not only admitted to officer Mitchell that he used heroin, he also

5   admitted it to paramedic George Baker, on his way to the hospital after the crash.  (IV RT 662.)

6   Baker observed injection sites under Petitioner's arms, and thought that Petitioner appeared to be

7   under the influence of an opiate.  (IV RT 662-663.)

8       Therefore, because counsel was not ineffective for failing to raise a further Miranda

9   objection, and, in any event, Petitioner has failed to demonstrate any resulting prejudice,

10  Petitioner's claim fails on the merits.

11        d.    Failure to Challenge Admission of Petitioner's Blood and Urine

12             Specimens

13       Petitioner claims that trial counsel was ineffective for failing to challenge "search and

14  seizure violations" relating to his claim that his blood and urine samples were extracted

15  involuntarily and were contaminated.  (Petition, at 5a-1.)  Again the record show that in fact trial

16  counsel made the challenge.

17       Again, trial counsel in fact raised the challenge.  Prior to trial, defense counsel sought to

18  exclude the admission of Petitioner's blood and urine samples on the grounds that they were

19  taken without Petitioner's consent, and were not incident to arrest.  (I RT 33-34.)

20       The court held a hearing pursuant to California Evidence Code section 402, where Officer

21  Crosswhite testified that after officer Mitchell examined Petitioner at the hospital, Petitioner was

22  informed that he was under arrest for driving under the influence of drugs and that he was

23  required to submit to a chemical test.  (I RT 42.)  Petitioner did not respond to officer

24  Crosswhite.  (I RT 42.)

25       A blood and urine sample were taken from Petitioner.  The blood sample was taken by a

26  nurse at the hospital.  Petitioner did not resist, and did not indicate that he did not want his blood

27  taken.  (I RT 42-43.)  Officer Crosswhite obtained a urine sample by using a sterile syringe from

28  the emergency room, which he removed from a sterile packaging, and inserted the syringe into

1   Petitioner's catheter bag.  He then placed the urine sample into a laboratory urine container.  (I

2   RT 43, 47.)  Petitioner did not object to Crosswhite taking the urine out of the catheter.  (I RT

3   43.)  Officer Crosswhite stated that Petitioner was laying on a gurney when the urine sample was

4   taken, and he was not physically disturbed or touched when the sample was taken.  (I RT 46.)

5   The blood and urine samples were taken approximately three hours after the accident.  (I RT 45-

6   46.)

7          Officer Crosswhite explained that Petitioner was arrested prior to the urine and blood

8   samples being obtained.  (I RT 44.)  However, due to his physical condition, he was re-arrested at

9   a later time.  (I RT 49, 61.)

10         After hearing the witnesses testimony and listening to argument by counsel, the trial court

11  concluded that both the urine and blood samples were admissible as they were obtained incident

12  to Petitioner's arrest.  With regard to the blood sample, the court determined that it was drawn in

13  a medically acceptable manner and was done as an incident to Petitioner's arrest, and therefore

14  admissible.  (I RT 67-68.)  However, with regard to the urine sample, the court expressed that

15  there was a question regarding the integrity of the sample due to the manner in which it was

16  obtained, i.e. by officer Crosswhite from the catheter bag and not the product of a midstream

17  catch.  (I RT 67-73.)

18         The prosecution pointed out that the results of the urine and blood tests were very similar,

19  which tended to indicate that a good urine sample was obtained.  In addition, defense counsel

20  acknowledged that Petitioner had not been given any drugs in the PCP family while he was at the

21  hospital.  (I RT 74.)

22         Defense counsel argued that the specimens were not taken incident to Petitioner's arrest,

23  and where therefore not admissible.  (I RT 42-74.)  Defense counsel cross-examined the

24  witnesses and argued his position to the trial court.

25         At the conclusion of the hearing, the trial court made the specific finding that officer

26  Crosswhite was a credible witness. (I RT 67.)  The trial court stated that officer Crosswhite had

27  the right to draw Petitioner's blood and take his urine sample because it was incident to arrest.  (I

28  RT 68.)  Because defense counsel challenged the admissibility of the evidence, he was not

1   ineffective.  The fact that the trial court ruled against Petitioner allowing the evidence to be

2   presented at trial, does not demonstrate that counsel was ineffective.  Petitioner's claim simply

3   fails on the merits.

4               e.       Failure to Challenge "Chain Of Control" of Samples

5          Petitioner contends that trial counsel was ineffective for failing to challenge the chain of

6   custody of his blood and urine samples.  (Petition, at 5a-1.)

7          Petitioner's claim is belied by the record.  Officer Crosswhite testified at trial that

8   Petitioner's blood sample was drawn by a hospital nurse into two separate vials provided by a

9   laboratory kit.  (III RT 373.)  The vials were marked with Petitioner's name, the date and time,

10  and were then sealed into an evidence envelope, which was initialed by officer Crosswhite.  (III

11  RT 374-376.)  The vials were thereafter transported to the Kern County jail.  (III RT 373.)

12  Officer Crosswhite noted the blood draw kit's assigned number in his police report.  (III RT 374.)

13         With regard to the urine samples, after the sample was obtained from Petitioner's catheter

14  bag by officer Crosswhite, it was put into a plastic urine container provided by the crime lab.  (III

15  RT 377.)  Officer Crosswhite filled out the label on the urine container with evidence tape, and

16  placed it into an evidence envelope that was sealed in the same manner as the evidence envelope

17  containing Petitioner's blood sample.  The urine sample was taken to the Kern County jail.  (III

18  RT 380-381.)

19          Kern County Laboratory Assistant Petra Imhof picked up Petitioner's blood and urine

20  samples from the Kern County jail, brought them back to the laboratory, clocked them in and

21  stored them inside the refrigerator.  (III RT 468-469.)  Imhof analyzed the blood and urine

22  specimens, and in doing so, she removed each specimen from their respective sealed evidence

23  envelope.  (III RT 470.)

24         Given the witnesses testimony regarding the examination of the samples and the well

25  established chain of custody of the samples, Petitioner has not shown that a challenge to the

26  chain of custody would have changed the outcome of the trial.  The Court notes, as did

27  Respondent, in his petition for writ of habeas corpus filed in the California Supreme Court,

28  Petitioner indicated that during his preliminary hearing, his former attorney elicited testimony

demonstrating that the chain of custody controls were violated as to these samples.

(Respondent's Lodged Doc. No. 5, at 7.)  However, neither Respondent nor this Court can find a

transcript of Petitioner's preliminary hearing in the record on appeal.  Nonetheless, there was no

chain of custody issues raised during trial, nor is there any merit to such a challenge, as the

record establishes an unbroken chain of custody of the samples free of contamination.  James v.

Borg, 24 F.3d 20, 27 (9th Cir. 1994); see also Shah v. United States, 878 F.2d 1156, 1162 (9th

Cir. 1989) ("The failure to raise a meritless legal argument does not constitute ineffective

assistance of counsel.") (quotation marks and citation omitted.)  Therefore, Petitioner's claim

fails on the merits.

f.   Challenge Statutorily Unauthorized Sentence

Petitioner contends that trial counsel was ineffective for failing to recognize that his

sentence was statutorily unauthorized.  Petitioner claims that he should have been sentenced on

one count of second degree murder, and that "all other bodily injuries or deaths" should have

been one year enhancements pursuant to Vehicle Code section 23182.[7]

As set forth by Respondent, the trial court sentenced Petitioner as follows: the upper term

of three years on count III (Cal. Veh. Code § 23153, subd. (a) [DUI -causing injury]), plus two

years for the Vehicle Code section 23182 enhancement (causing bodily injury or death to more

than one person during a DUI accident), for a total of five years on count III.  (CT 327; RT 1028.)

On both of the second degree murder convictions in counts I and II (§ 187, subd. (a)), the trial

court imposed fifteen years to life sentences, to be served consecutive to each other, and

consecutively to the five year sentence imposed on count III.  (CT 328; RT 1029-1030.)  In

addition, four one year terms were imposed on count II, for the four prior prison term

enhancements pursuant to section 667.5, subdivision (b).  Thus, the aggregate sentence imposed

was the fixed term of 9 years (Five years on count III plus four years for the prior prison terms on

count II), plus fifteen years to life (count I), plus fifteen years to life (count II).  (CT 1029.)

---

[7] Vehicle Code section 23182 was repealed and replaced on July 1, 1999.  (See Stats. 1998, c.118 (S.B. 1186); Stats. 1998, c.756 (A.B. 762).)  It is now Vehicle Code § 23558; and the language of these two provisions is essentially identical.

1   As Respondent correctly argues, because Petitioner was properly sentenced under

2   California law, Petitioner's counsel could not have been ineffective for failing to challenge the

3   alleged "unauthorized" sentence.  Petitioner was properly sentenced to two consecutive fifteen

4   years to life terms for the two second degree murder convictions for the deaths of Virginia

5   Adams and Ruben Pinon on counts I and II.  In addition to causing the deaths of Virginia Adams

6   and Ruben Pinon, Petitioner seriously injured Sarah Adams, Katherine Tange, and Clyde Tange

7   in the accident.  (II RT 200, 205-210.)  Thus, he was properly sentenced on count III for driving

8   under the influence of alcohol and drugs, causing injury (Cal. Veh. Code § 23153, subd. (a)), and

9   a two year multiple victim enhancement was properly imposed on that count pursuant to

10  California Vehicle Code section 23182.

11  California Vehicle Code section 23182 was a sentence enhancement statute that was

12  properly applied in this case to enhance Petitioner's sentence.  Because Petitioner was properly

13  sentenced and counsel was not ineffective for failing to argue that California Vehicle Code

14  section 23182 only mandated the imposition of one year terms for the second degree murder

15  convictions, and the driving under the influence, causing injury conviction, Petitioner's claim

16  fails on the merits.

17  D.    Ineffective Assistance of Appellate Counsel

18  Petitioner contends that appellate counsel was ineffective for not raising a *Miranda*

19  and/or search and seizure issue or an issue related to his sentencing error claim on appeal or in a

20  petition for writ of habeas corpus.  (Petition, at 5b-1.)

21  As with the ineffective assistance of trial counsel, Petitioner raised this claim in his state

22  habeas corpus petition presented to the California Supreme Court, which issued a summary

23  denial.  (Respondent's Lodged Doc. No. 5.)  Therefore, this Court will independently review the

24  record to determine whether relief is available under section 2254(d).  Delgado, 223 F.3d at 982.

25  Effective assistance of appellate counsel is guaranteed by the Due Process Clause of the

26  Fourteenth Amendment.  Evitts v. Lucey, 469 U.S. 387, 391-405 (1985).  Claims of ineffective

27  assistance of appellate counsel are reviewed according to Strickland 's two-pronged test.  Miller

28  v. Keeney, 882 F.2d 1428, 1433 (9th Cir.1989); United States v. Birtle, 792 F.2d 846, 847 (9th

21

Cir.1986); See also Penson v. Ohio, 488 U.S. 75, 109 S.Ct. 346, 353-54 (1988) (holding that where a defendant has been actually or constructively denied the assistance of appellate counsel altogether, the Strickland standard does not apply and prejudice is presumed; the implication is that Strickland does apply where counsel is present but ineffective).

To prevail, Petitioner must show two things. First, he must establish that appellate counsel's deficient performance fell below an objective standard of reasonableness under prevailing professional norms. Strickland v. Washington, 466 U.S. 668, 687-88, 104 S.Ct. 2052, 2064 (1984). Second, Petitioner must establish that he suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional errors, she would have prevailed on appeal. Id. at 694. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. Id. The relevant inquiry is not what counsel could have done; rather, it is whether the choices made by counsel were reasonable. Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir.1998). The presumption of reasonableness is even stronger for appellate counsel because he has wider discretion than trial counsel in weeding out weaker issues; doing so is widely recognized as one of the hallmarks of effective appellate assistance. Miller v. Keeney, 882 F.2d 1428, 1434 (9th Cir.1989). Appealing every arguable issue would do disservice to the Petitioner because it would draw an appellate judge's attention away from stronger issues and reduce appellate counsel's credibility before the appellate court. Id. Appellate counsel has no constitutional duty to raise every nonfrivolous issue requested by petitioner. Id at 1434 n.10 (citing Jones v. Barnes, 463 U.S. 745, 751-54, 103 S.Ct. 3308 (1983)).

Because there is no merit to Petitioner's substantive Miranda violation or illegal search and seizure claims or his claim that trial counsel was ineffective Petitioner's claim that appellate counsel was ineffective for failing to raise these claims is without merit. Turner v. Calderon, 281 F.3d 851, 872 (9th Cir. 2002) ("A failure to raise untenable issues on appeal does not fall below the Strickland standard."); Gustave v. United States, 627 F.2d 901, 906 (9th Cir. 1980) ("There is no requirement that an attorney appeal issues that are clearly untenable. Counsel need not appeal every possible question of law at the risk of being found to be ineffective."). Based on the foregoing, Petitioner's claim fails, and the state court's rejection of this claim was not contrary

1    to, or an unreasonable application of, clearly established Supreme Court precedent.

2    E.      Insufficient Evidence to Support Two Counts of Second Degree Murder

3           Petitioner contends that there is insufficient evidence to support his second degree murder

4    convictions in counts I and II.  More specifically, Petitioner contends that the evidence did not

5    establish implied malice.  (Petition, at 6.)

6           Petitioner raised this claim in his direct appeal to the California Court of Appeal, which

7    rejected the claim in a reasoned opinion.  (Respondent's Lodged Doc. No. 3.)  Petitioner then

8    filed a petition for review to the California Supreme Court, which issued a summary denial.

9    (Respondent's Lodged Doc. No. 4.)  Because the California Supreme Court's opinion is

10   summary in nature, however, this Court "looks through" that decision and presumes it adopted

11   the reasoning of the California Court of Appeal, the last state court to have issued a reasoned

12   opinion. See Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n. 3, 111 S.Ct. 2590, 115 L.Ed.2d 706

13   (1991) (establishing, on habeas review, "look through" presumption that higher court agrees with

14   lower court's reasoning where former affirms latter without discussion); see also LaJoie v.

15   Thompson, 217 F.3d 663, 669 n. 7 (9th Cir.2000) (holding federal courts look to last reasoned

16   state court opinion in determining whether state court's rejection of petitioner's claims was

17   contrary to or an unreasonable application of federal law under § 2254(d)(1)).

18          The law on insufficiency of the evidence claim is clearly established.  The United States

19   Supreme Court has held that when reviewing an insufficiency of the evidence claim on habeas, a

20   federal court must determine whether, viewing the evidence and the inferences to be drawn from

21   it in the light most favorable to the prosecution, any rational trier of fact could find the essential

22   elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979).

23   Sufficiency claims are judged by the elements defined by state law.  Id. at 324, n. 16.

24          In the instant petition, Petitioner admits that he was driving while under the influence of

25   heroin at the time of the accident which resulted in two deaths and injuries.  Petitioner claims the

26   accident was caused by him being "cold-cocked" twice, once in each eye by his passenger R.

27   Pinon, (one of the decedents), which rendered him unconscious.  (Petition, at 6a-1.)  Petitioner

28   claims that the brief episode of reckless driving is insufficient to establish a conscious disregard

1  for life, or an actual appreciation for the risks created by driving under the influence of a drug.

2  (Pet. at 6a-1.)  In addition, Petitioner contends that the record was devoid of proof regarding his

3  subjective state of mind or that he actually appreciated the danger he was creating when he drove.

4  (Id.)

5        In rejecting Petitioner's claim on direct appeal, the Court of Appeal stated:

6            [Petitioner] contends that the evidence is insufficient to sustain his
             convictions in counts I and II for second degree murder because it failed to
7            establish that he acted with implied malice.  We disagree.

8            In *People v. Watson*, 30 Cal.3d 290 (1981),[8] the Supreme Court held that a
             defendant charged with killing another while driving in an intoxicated condition
             may be convicted of second degree murder if the facts surrounding the offense
9            support a finding of "implied malice."  *Id.* at 294.  Second degree murder on an
             implied malice theory occurs when: 1) The killing resulted from an intentional act,
10           2) The natural consequences of the act are dangerous to human life, and 3) The act
             was deliberately performed with knowledge of the danger to, and with conscious
11           disregard for, human life.  (CALJIC No. 8.31, *People v. Watson*, 30 Cal.3d at
             300.)
12           [Petitioner] does not dispute that the killing resulted from his actions in
             driving under the influence of heroin and that the consequences of driving in such
13           an intoxicated state is dangerous to human beings.  Instead he contends that the
             evidence failed to establish that he appreciated the fact that he was endangering
14           human lives.  We disagree.
             The prosecutor presented evidence that in 1990 [Petitioner] participated in
15           a substance abuse class that included a section on the dangers of driving under the
             influence of alcohol and drugs.  The record also disclosed that in 1995 [Petitioner]
16           was arrested after he was found passed out in the driver's seat of a car stopped in a
             traffic land with its engine running.  During a post-arrest interview [Petitioner]
17           admitted that he had used too much heroin to drive safely.  Further, during cross-
             examination [Petitioner] acknowledged that he had seen public service
18           announcements showing people who had been killed by people driving under the
             influence.  The jury could reasonably find from these circumstances that
19           [Petitioner] appreciated the risks of driving under the influence of heroin.
             Additionally, [Petitioner] drove erratically down Nile Avenue at
20           approximately 80 miles per hour, he skidded sideways into the intersection of Nile
             and Shalimar Avenues against a red light after failing to pass a car on the right
21           side, and he struck two other vehicles prior to colliding with the victim's car.  The
             jury could reasonably find that any one of these circumstances or incidents was
22

23        [8] Watson was a driving under the influence murder case where a collision resulted in two deaths.  The court
          defined implied malice as where a person, knowing that his conduct endangers the life of another, nonetheless acts
24        deliberately with conscious disregard for life.  The court stated that "a finding of implied malice depends upon a
          determination that the defendant actually appreciated the risk involved, i.e., a subjective standard."  People v.
25        Watson, 30 Cal.3d at 296-97.  The court held that "when the conduct in question can be characterized as an wanton
          disregard for life, and the facts demonstrate a subjective awareness of the risk created, malice may be implied" and a
26        murder charge is appropriate.  Id. at 298.  The court went on to hold that under the facts of the case, where he drove
          at highly excessive speeds through city streets nearly colliding with a vehicle after running a red light, resuming the
27        excessive speed and belatedly attempting to brake before colliding with the victim's car, "these facts reasonably and
          readily support a conclusion that defendant acted wantonly and with a conscious disregard for human life."  Id. at
28        301.

1  sufficient to place [Petitioner] on notice that his erratic driving was endangering
   the lives of other people on the street. *People v. Olivas*, 172 Cal.App.3d 984, 988
2  (1985) [minor pre-accident collision sufficient to apprize defendant under the
   influence of PCP of which he was creating].  Accordingly, we find that the record
3  contains ample evidence supporting the jury finding that [Petitioner] acted with
   implied malice.
4          [Petitioner] contends that the 1995 incident and the public service
   announcements may show that he should have realized the risk of driving under
5  the influence but that they do not show that he actually did.  Such certainty is not
   required; the jury was entitled to draw a reasonable inference that [Petitioner]
6  gained awareness through the above noted experiences.  (Cal. Evid. Code, § 210.)
7          [Petitioner] also contends that his erratic driving was insufficient to prove
   an actual appreciation on his part that he was endangering other people's lives
8  because it occurred during a short period of time and over a distance of only a
   mile.  We disagree.  However brief this episode may have been, there were several
9  specific incidents during this brief interlude which, as noted above, should have
   altered [Petitioner] that his driving was endangering the lives of others.  Thus we
10 conclude that the record contains substantial evidence which support's
   [Petitioner's] conviction for second degree murder in counts I and II.

11 (Respondent's Lodged Doc. No. 3, at 4-6.)

12      Malice is implied when: 1) the killing resulted from an intentional act; 2) the natural

13 consequences of the act are dangerous to human life; and 3) the act was deliberately performed

14 with knowledge of the danger to, and with conscious disregard for, human life.  (CT 195.)

15      As set forth by the Fifth District Court of Appeal, sufficient evidence supports the jury's

16 finding of implied malice as to the two counts of second degree murder.  Several witnesses

17 testified to observing an erratic driving pattern by Petitioner just prior to the collision.

18 Specifically, Debbie Duffle testified that on February 24, 1998, she observed Petitioner's Camaro

19 "going real fast" about 80 miles per hour.  (II RT 107-109.)  Brent Petersen testified that on

20 February 24, 1998, Petitioner sideswiped his truck that was parked on Shalimar street, shoving

21 the truck up against the curb, causing damage to the vehicle.  (II RT 120-122, 124-125.)

22 Petitioner did not stop and proceeded to accelerate ahead.  (II RT 127-128.)  During this time,

23 Mr. Petersen did not observe any contact between the passenger and the driver of the Camaro.  (II

24 RT 127.)  Talmage Green, and his wife Rose Ann Green, testified that on February 24, 1998, as

25 they were proceeding Eastbound on Niles Street, they were approached from behind by

26 Petitioner's Camaro, who was darting in and out of traffic in an erratic manner, causing Mr.

27 Green to pull off to the side of the road.  (II RT 144-146, 148, 174-175.)  Mr. Green testified that

28 as the Camaro passed him, the passenger (Pinon) smiled at him.  (II RT 147-149, 152-154, 171-

1   175.)  Rose Ann Green did not observe any activity between the driver and the passenger as the

2   Camaro passed by.  (II RT 176-177.)  Just after passing by Petersen, Ira Hill testified that on

3   February 24, 1998, as he was attempting to turn south on Shalimar Street, he felt a push in the

4   back of his truck, and then Petitioner's Camaro went around the passenger's side of his vehicle.

5   (II RT 150-151, 173-175, 188-191.)  The Camaro skidded sideways across Shalimar Avenue into

6   the northbound lanes of traffic and struck, and then landed upside down on the Honda Accord

7   driven by Sarah Adams, killing Virginia Adams and Ruben Pinon.  (II RT 215-220, IV RT 517-

8   523.)

9           In addition, as stated by the Court of Appeal, the prosecution introduced evidence that in

10  1990, Petitioner participated in a substance abuse class that included a section on the dangers of

11  driving under the influence of alcohol and drugs.  (III RT 415-416; III RT 452-453; IV RT 620.)

12  Further, there was evidence presented that in 1995, Petitioner was arrested after he was found

13  passed out in the driver's seat of his car stopped in the middle of a traffic lane with the engine

14  running.  (III RT 420-422.)  In a post-arrest interview, Petitioner admitted that he had used heroin

15  his whole life and that he had used too much to drive safely.  (III RT 444.)  During cross-

16  examination, Petitioner acknowledged that he had seen public service announcements

17  demonstrating individuals who had been killed by people driving while under the influence.  (IV

18  RT 620.)

19          As Respondent states, it is the responsibility of the jury to determine the credibility of the

20  witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts.

21  Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995).  The evidence outlined above when

22  considered by the jury supports its finding of implied malice as to the two counts of second

23  degree murder.  As evidenced by their verdicts, the jury rejected Petitioner's claim that he was

24  unconscious at the time of the accident and deaths of Virginia Adams and Ruben Pinon.  Because

25  the determination of whether Petitioner was unconscious at the time of the incident was a jury

26  determination, it is not a basis upon which this Court can grant the instant petition.  Accordingly,

27  Petitioner has failed to prove that the evidence in support of his second degree murder

28  convictions was insufficient to have led a rational trier of fact to find him guilty beyond a

1   reasonable doubt and the claim is without merit.

2   F.      Request for Evidentiary Hearing

3          Petitioner requests an evidentiary hearing in order to properly "inquire as to trial

4   counsel's response to disputed facts in his failure to request an independent expert witness on

5   intoxication, blood and/or urine analysis contamination, and as to why he allowed petitioner to be

6   sentenced illegally as stated above to 34 years to life in state prison."  (Traverse, at 6.)

7          Because Petitioner's ineffective assistance of counsel claims fail on the merits, an

8   evidentiary hearing is not warranted.  Petitioner's ineffective assistance of counsel claims can be

9   resolved by reference to the state court record, are based on speculation, and are legally without

10  merit, and no evidentiary hearing is warranted.  See Harris v. Pulley, 885 F.2d 1354, 1378 (9th

11  Cir. 1988) (where the claim presents a purely legal issue an evidentiary hearing is inappropriate);

12  United States v. Zuno-Acre, 209 F.3d 1095, 1103 (9th Cir. 2000) (speculation is not a basis for an

13  evidentiary hearing), overruled on other grounds, Valerio v. Crawford, 306 F.3d 742, 763 (9th

14  Cir. 2002) (en banc); Baja v. Ducharme, 187 F.3d 1075, 1078 (9th Cir. 1999) (if claim can be

15  resolved by reference to state court record, evidentiary hearing unnecessary).

16                                        RECOMMENDATION

17         Based on the foregoing, it is HEREBY RECOMMENDED that:

18         1.      The petition for writ of habeas corpus be DENIED; and

19         2.      The Clerk of Court be directed to enter judgment in favor of Respondent.

20         These Findings and Recommendations are submitted to the assigned United States

21  District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-

22  304 of the Local Rules of Practice for the United States District Court, Eastern District of

23  California.  Within thirty (30) days after being served with a copy, any party may file written

24  objections with the court and serve a copy on all parties.  Such a document should be captioned

25  "Objections to Magistrate Judge's Findings and Recommendations."  Replies to the objections

26  shall be served and filed within ten (10) court days (plus three days if served by mail) after

27  service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to

28  28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the

1    specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951

2    F.2d 1153 (9th Cir. 1991).

3         IT IS SO ORDERED.

4         **Dated:   June 1, 2006**           **/s/ Dennis L. Beck**
     3b142a                              UNITED STATES MAGISTRATE JUDGE

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28